# **<u>EXHIBIT 1</u>**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Certain 03 MDL 1570 PLAINTIFFS | |
| **ASHTON** Plaintiffs et al., | 02 CV 6977 (GBD) (SN) |
| v. | **AMENDED COMPLAINT** |
| THE REPUBLIC OF SUDAN, NATIONAL ISLAMIC FRONT, HASSAN AL TURABI, and OMAR HASSAN AHMED AL BASHIR, | 03 MDL 1570 (GBD) (SN) |
| Defendants. | |

## <u>ASHTON AMENDED COMPLAINT AS TO SUDAN DEFENDANTS</u>

*This document relates to*:  *Ashton et al. v. Al Qaeda, and the Republic of Sudan et al., 02 cv 6977(GBD)(SN).*

ASHTON Plaintiffs filed a Consolidated Master Complaint on March 6, 2003 that named as defendants al Qaeda, the Republic of Sudan and others.  Service was effectuated upon the Sudanese Ministry of Foreign Affairs, as transmitted by the Embassy of the United States of America, in Khartoum, Sudan on April 29, 2003 in accordance with the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608 et seq.  The action was consolidated under 03 MDL 1570 In re 9/11 Terror Attack.  That complaint was amended several times as to other defendants and additional plaintiffs were also added with the Court's permission and order that no additional service on the same defendants was required (ECF No. 247, CMO #2 6/16/04, ¶12).  The Court set a deadline for the filing of all amended complaints in 2005, and the last amendment was the 6th Amended Complaint, 02 cv 6977, filed on September 30, 2005.  When Sudan failed to answer or appear, default was entered by the Court Clerk on December 22, 2011 (02 cv 6977 ECF No. 652).

The instant amended complaint incorporates allegations and identity of plaintiffs pled in the 6th Amended Complaint and supplements those allegations herein as to the Sudan defendants only in order to update the prior pleading with changes in the law, along with conclusions of law and evidentiary disclosures made by U.S. Courts, the U.S. government and other parties. This amended pleading is not intended to replace or supplant the operative 6th Amended Complaint, 02 cv 6977, filed on September 30, 2005, as the allegations and claims are substantially the same. Plaintiffs accordingly respectfully request a trial by default seeking judgment against Sudan.

## THE PARTIES

1. Plaintiffs are the surviving spouses, children, parents, siblings and estate representatives of the victims murdered in the September 11, 2001 terrorist attacks on the United States (the "September 11th Attacks") and individuals who suffered personal injuries in the September 11th Attacks identified in the 6th Amended Complaint.

2. The defendant REPUBLIC OF SUDAN ("Sudan") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) and 1603(a) and is located on the continent of Africa and borders the Red Sea west of Saudi Arabia and south of Egypt. Sudan maintains an Embassy in Washington, D.C. located at 2210 Massachusetts Avenue, N.W., Washington, D.C. 20008-2831.

3. The defendant Sudan has, since 1993 and at all relevant times herein, been designated by the United States Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 18 U.S.C. § 2333. The defendant Sudan by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted, and conspired with a variety of groups that use terror to pursue their goals.

The defendant Sudan has provided financing, training, safe haven, and weapons for terrorist groups including the defendants al Qaeda and Osama Bin Laden, through its officials, officers, employees and agents, including but not limited to its political entity, defendants the National Islamic Front, its leader Hassan al Turabi, and Omar Hassan Ahmad al Bashir, the President of Sudan.

## JURISDICTION AND VENUE

4.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1330, as the claims against Sudan fall within the exceptions to foreign sovereign immunity set forth at 28 U.S.C. §§ 1605(a)(5), 1605A, and 1605B of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., as well as the exception to immunity formerly set forth at 28 U.S.C. § 1605(a)(7).

5.     Plaintiffs further bring this action against the defendant Sudan under the 2016 Justice Against Sponsors of Terrorism Act (JASTA), which Congress enacted over a Presidential veto

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against…foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States…

28 U.S.C. §2333 note; as a result, JASTA establishes federal court jurisdiction over the tortious acts of a foreign state anywhere in the world that cause injury and death in a terrorist attack in the United States.

6.     The defendant Sudan is a foreign state within the meaning of 28 U.S.C. §1603(a), and "Sudan" as used hereinafter refers to its government ministries and other bodies (including but not limited to the National Islamic Front, its  Ministry of the Interior, Ministry of Foreign

Affairs, Ministry of Defense, Military Intelligence, State Security, Popular Defense Force, Revolutionary Security Services, and its Embassies throughout the world), its alter-egos, and its officials, employees, or agents while acting within the scope of their office, employment, or agency, including but not limited to defendants Hassan al Turabi ("Turabi"), and Omar Hassan Ahmad al Bashir ("Bashir").

7. The defendant Sudan is subject to jurisdiction pursuant to 28 U.S.C. §1330 and JASTA's 28 U.S.C. §1605B, in that, as set forth in detail below, this action seeks money damages against Sudan for injury and death caused by the September 11th Attacks, which constitute an act of "international terrorism" in the United States as defined in 18 U.S.C. §2331, alleges that the September 11th Attacks and the resulting injuries and deaths were caused by a tortious act or acts by Sudan, by providing material support and resources to and facilitating the al Qaeda leaders, planners and hijackers responsible for the September 11th Attacks, and that such act or acts constitute more than mere negligence, and were intentional, knowing, reckless, willful and/or grossly negligent.

8. The defendant Sudan is also subject to jurisdiction pursuant to 28 U.S.C. §1330 and 28 U.S.C. §1605(a)(5) and the exception to immunity previously set forth at 28 U.S.C. §1605(a)(7), in that, as set forth in detail below, this action seeks money damages against Sudan for injury and death occurring in the United States and caused by the tortious act or omission of Sudan and/or one or more of its officials or employees acting within the scope of their office or employment.

9. Venue is proper in this District pursuant to the Air Transportation Safety and System Stabilization Act, (Pub. Law 107-42, 115 Stat. 230), 49 U.S.C. § 40101, Title IV, § 408(b)(3), designating the Southern District of New York ("S.D.N.Y.") as the exclusive venue

for all civil litigation arising out of, or related to the September 11th Attacks, and 28 U.S.C. 1391(b)(2) and 1391(f)(1) because a substantial number of acts, occurrences, injuries and deaths occurred in the Southern District of New York.

## SUMMARY OF ALLEGATIONS

10. Plaintiffs seek such relief against Sudan for the attributable acts of Sudan's governmental ministries and bodies, alter-egos, and officers, employees and agents acting within the scope of their office, employment or agency, including but not limited to the National Islamic Front, Hassan al Turabi and Omar Hassan Ahmed al Bashir, by knowingly providing material support and resources to the al Qaeda terrorist organization and facilitating the September 11th Attacks, in that, as set forth in detail herein, they:

a. raised, laundered and paid substantial financial support to al Qaeda to fund its budget and terrorist activities, including the preparation and execution of the September 11th Attacks;

b. funded and sponsored the terrorist training camps where al Qaeda indoctrinated and taught their hijackers the skills they used to carry out the September 11th Attacks;

c. provided critical logistical support and resources to al Qaeda around the world, funding safe houses, furnishing false passport and travel documents, transferring al Qaeda money, weapons and equipment across international borders and other assistance, all of which enabled al Qaeda to conduct the September 11th Attacks;

d. actively supported al Qaeda in its preparations for the September 11th Attacks through a network of the Sudan's officers, employees and/or agents who aided al Qaeda terrorists, including the hijackers, providing them with money, cover, advice, contacts,

transportation, and other assistance, including militant and terror training and other material support and resources.

11.     The plaintiffs who are the estate representatives of a decedent and are listed as such in the caption, have been duly appointed by a court prior to the commencement of this action and have the legal authority to bring this action to recover the damages set forth herein, including wrongful death damages on behalf of all legally entitled beneficiaries of the decedent and survival damages for the decedent's personal injuries.

**Al Qaeda's Move to Sudan**

12.     Osama Bin Laden, with the assistance of Saudi government sponsored charities, created al Qaeda in Pakistan and Afghanistan in the late 1980s as the Jihad against the Soviet Union for its invasion of Afghanistan began winding down.

13.     In 1989, Hassan al Turabi, Omar Hassan Ahmed al Bashir, and the National Islamic Front installed an extremist government in Sudan via a *coup d'etat.* Within weeks of taking power, emissaries of the new government in Sudan traveled to Pakistan and Afghanistan where they met with Bin Laden and al Qaeda.  Sudan invited Bin Laden and al Qaeda to relocate their operations to Sudan.  Members of al Qaeda travelled to Sudan for an assessment mission. They returned to Pakistan and Afghanistan and made a positive report to Bin Laden and al Qaeda. By the end of 1990 members of al Qaeda were working jointly with Sudan preparing the infrastructure for al Qaeda's move to Sudan.  A member of the Sudanese Intelligence service bought five farms in Sudan for the use of al Qaeda as training camps.

14.     A CIA report indicated that "Bin Ladin moved al-Qaida to Sudan, at the behest of the National Islamic Front."

15.     In 1991, Osama Bin Laden relocated his terrorist operation from Afghanistan and Pakistan to Sudan and began to use the country as a base for al Qaeda's business operations and preparation for jihad.  Sudan's intelligence agency provided personal security for Bin Laden. During this time period, Sudan abandoned visa requirements for Arabs and actively encouraged representatives of Islamic militant organizations to live within its borders. Sudan and al Qaeda jointly vetted representatives of these organizations.

16.     A 1996 State Department fact sheet on Osama Bin Laden described his operations in the country beginning in 1991:

> "Bin Laden relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan Al Turabi. . . . [bin Laden] embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf."

**Al Qaeda and Sudan's Symbiotic Relationship**

17.     The symbiotic relationship between al Qaeda and Sudan allowed al Qaeda a safe haven in which it grew into a complex multi-faceted terrorist organization with global reach.  For its role in the symbiotic relationship, the Sudanese government gained the prestige of hosting a renowned mujahideen leader who came from a prominent Saudi family that owned one of the largest construction companies in Saudi Arabia, a cadre of trained fighters useful for the war it was waging on its own people in southern Sudan, and well-funded charities that would support Sudan's military, political and religious goals and provide sorely needed investment funds from the wealthiest country in the region, Saudi Arabia.

18.     The CIA wrote, "While based in Sudan from 1992-96, al-Qa'ida was transformed from an only partially realized idea to an international organization ready to operate on its own.

A major factor in this development was the education al-Qa'ida members received working with officials of Sudan's National Islamic Front."

19.      In a report for the Congressional Research Service, a former CIA analyst wrote that after Bin Laden left Sudan, Hassan al Turabi, "Continues to be politically and ideologically close to Usama Bin Laden, even though Turabi acquiesced in bin Ladin's expulsion from Sudan in 1996. Bin Ladin sees Turabi as a mentor and an ideological source of inspiration."

20.      As detailed below, from its Sudan base, al Qaeda planned and trained for attacks against U.S. interests in Yemen, Somalia, Kenya, Tanzania and in the United States itself.  The first planning for the 9/11 Attacks took place at the al Qaeda headquarters in Khartoum.

21.      As detailed below, Bin Laden and al Qaeda's construction projects provided developmental showcases for Sudanese government and provided international cover for al Qaeda operatives to move people and money around the world.

22.      As detailed below, Sudan also made use of emergency relief projects implemented by al Qaeda-affiliated charities in the war zones of Southern Sudan.

23.      Central to implementing the symbiotic relationship was the role of the al Shamal Islamic Bank, founded in 1983 by the State Government of Northern Sudan.  Bin Laden made his first trip to Sudan in the same year ostensibly for business and agricultural investment purposes.

24.      The Chairman of the Board of Directors of al Shamal Islamic Bank was Abdel Wahab Osman, Sudan's Minister of Industry, Minister of Energy and later Minister of Finance & National Economy.

25.      The Sudan-based Faisal Islamic Bank also became a shareholder of al Shamal. The parent company of the Faisal Islamic Bank was Dar al Maal al Islami, registered in the

Bahamas but operating out of Switzerland. These two entities were chaired by Saudi Prince Mohammed Bin Faisal al Saud, son of the former King and brother of the head of Saudi Intelligence. Hassan al Turabi held a seat on the board of directors of Dar al Maal al Islami. Turabi's office was the penthouse of the Faisal Islamic Bank building in Khartoum. Faisal Islamic Bank knowingly and willingly held accounts for al Qaeda.

26.     In 1991, Sudan's Finance Minister Abdelrahim Hamdi hosted an international conference in Khartoum regarding foreign investment in Sudan. Numerous Saudi businessmen as well as members of al Qaeda attended. One of the results of the conference was the infusion of capital to al Shamal Islamic Bank and the creation of shares held by or on behalf of Bin Laden and al Qaeda.

27.     In 1996, coincident with Bin Laden's departure from Sudan, Adel Abdul Jalil Batterjee, a Saudi businessman with no prior experience in banking, became al Shamal's chairman. Batterjee did, however, have experience with al Qaeda. Batterjee was the founder of Saudi charity Lajnat al Bir and its successor the Benevolence International Foundation (BIF). Both were affiliated with Saudi-based World Assembly of Muslim Youth. Lajnat al Bir supported al Qaeda in Pakistan and as noted below BIF supported al Qaeda in Sudan. BIF became the largest shareholder of al Shamal Islamic Bank and kept its account there. Batterjee and the Benevolence International Foundation were eventually listed as Specially Designated Global Terrorists by the U.S. Government for their roles as supporters of al Qaeda.

28.     An al Qaeda defector told U.S. law enforcement that Bin Laden and at least six al Qaeda operatives held bank accounts in al Shamal Islamic Bank. In testimony at the criminal trial of the 1998 African Embassy bombers, the same defector, Jamal al Fadl, testified that al Qaeda members received monthly checks from al Shamal Islamic Bank and that he transferred

funds from al Shamal Islamic Bank to support al Qaeda's overseas operations and procurement, including transfers to the United States. In 1993, $250,000 was wired from the al Shamal Islamic Bank account of al Qaeda's corporate entity, Wadi al Aqiq, via Bank of New York, to a Bank of America account in Dallas, Texas held by an associate of Bin Laden – where he used it to buy a plane in Tucson, Arizona. The plane was then flown to Khartoum.

29.     Al Shamal Islamic Bank held accounts for al Qaeda companies including Wadi al Aqiq, Rowad Development and al Hijrah Construction. These businesses enriched the National Islamic Front and solidified its hold on power while at the same time providing employment to the al Qaeda Afghan veterans. The corporate entities also provided the perception of a legitimate front which masked al Qaeda's preparations for terror.

30.     While al Shamal Bank was used largely for international transactions, al Qaeda also needed a domestic bank to handle its local business. In 1991 the NIF and Bin Laden established Bank al Muzare aka Farmers Commercial Bank. As detailed below, the Farmers Commercial Bank implemented al Qaeda-related transactions during the time period of the preparation for the 9/11 Attack.

31.     Along with senior members of the NIF, Bin Laden founded Wadi al Aqiq, termed "the mother company". According to the United States State Department, Wadi al Aqiq and another Bin Laden company, Taba Investments Ltd., "secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower and sesame products." The State Department also noted that the Bin Laden company al Hijra Construction worked with Sudanese military officials to transport and provide provisions to Bin Laden's terrorist training camps in northern Sudan.

32.     Bin Laden's al Hijra Construction built the Tahaddi a/k/a Challenge Road linking Khartoum to Port Sudan. President Bashir led a public ceremony to open the first phase.

33.     Joining in the Tahaddi road project was the Saudi Bin Laden Group (SBG), a Bin Laden family company in which Osama was a founding shareholder, and created in 1989 just as al Qaeda began moving to Sudan.  SBG provided support and contributions to projects in Sudan via its Public Buildings and Airports Division.

34.     SBG constructed the Port Sudan Airport. SBG boasted of this:

> Over the years the Division has undertaken various challenging projects, large and medium scale, including complete airports and roads. . . . The projects executed include-
> . . Port Sudan Airport. SBG's skills- . . . has been recognized and utilized in the United Arab Emirates, Jordan, Yemen and Sudan.

The agreement for the construction of an airport in Port Sudan was between the Republic of Sudan and the Saudi Bin Laden Group.  The relationship among Osama Bin Laden, the Republic of Sudan, and the SBG were highlighted during the inauguration ceremony of the Port Sudan airport:

> Meanwhile, Osama Bin Laden, was the first guest invited to attend the inauguration of the new Port Sudan Airport. He sat in the front row and was the guest of honor in this ceremony. It was a group of Bin Laden's companies that carried out the project of the new and modern airport that cost huge amounts of money.

35.     Another company jointly controlled by Bin Laden, Sudan and Saudi businessman Yasin Kadi, was the Khartoum-based Rowad Development and Investment (Rowad).  Rowad was co-located with al Shamal Bank.  Rowad's shareholders included al Shamal Bank, as represented by the Sudan Minister of Finance, two companies owned by Yasin Kadi, an Executive Order 13324 Specially Designated Global Terrorist, and Wadi al Aqiq, Bin Laden's holding company. Rowad's corporate documents contain the signature of Bin Laden as the representative of Wadi al Aqiq.  Rowad's corporate officers included the chairman of al Shamal,

11

an officer of Yasin Kadi's Muwafaq Foundation, and a former employee of the Saudi Embassy in Washington DC.

36.    Rowad was involved in the agricultural sector including the processing and sale of sesame seeds.  As noted above, Sudan gave al Qaeda a monopoly on the export of sesame products and other agricultural commodities.

37.    As detailed below, after Bin Laden left Sudan in 1996, several of the principals involved in Rowad continued the trade in sesame from Sudan.

38.    Al Qaeda and Sudan also cooperated under the cover of so-called charitable activity.  Al Dawa al Islamiya (Islamic Call) was instrumental in helping establish al Qaeda in Sudan.  Senior officers of Islamic Call were members of the National Islamic Front. They opened bank accounts for al Qaeda and helped with the founding of the al Qaeda's mother company Wadi al Aqiq.

39.    The Islamic African Relief Agency (IARA), a charity based in Khartoum with fund-raising subsidiaries in many countries including the United States, supported al Qaeda and Bin Laden. NIF members founded and directed IARA.  Senior Sudanese intelligence officers together with Bin Laden senior aides, ran the IARA branch in Pakistan and Afghanistan in support of Bin Laden's activities.  IARA officials regularly met with President Bashir to plan strategy regarding fighting the Sudanese civil war, including plans to attack Western humanitarian organizations attempting to help the victims of that war.  IARA facilitated the NIF's financing of al Qaeda's attack on U.S. armed forces in Somalia.

40.    As noted below IARA provided significant financial assistance to al Qaeda during the planning and implementation of the 9/11 Plot.

41.     In October 2004, IARA was listed as a Specially Designated Global Terrorist by the U.S. Department of the Treasury for providing "direct financial support" for Bin Laden.

42.     The Third World Relief Agency (TWRA) was founded and operated by Sudanese intelligence officials and assisted al Qaeda in moving its personnel and weaponry internationally. TWRA's weapons trafficking to al Qaeda in Bosnia was coordinated with Hassan al Turabi.

43.     As noted above, Lajnat al Bir al Islami (LBI) was a Saudi-based charity affiliated with the World Assembly of Muslim Youth.  LBI operated closely with al Qaeda during its formative years in Pakistan and Afghanistan.  As part of the agreement establishing the symbiotic relationship between al Qaeda and Sudan, LBI was renamed the Benevolence International Foundation (BIF) and began operating inside Sudan.

44.     BIF presented a public face of humanitarian action in support of victims of war but internally declared that its main role was to support jihad.  BIF assisted al Qaeda and Sudan with military, logistical support and medical care for the mujahidin and also cared for their families.

45.     From its Sudan base, BIF facilitated the movement of al Qaeda operatives around the world.  One such operative was Mahmdou Mahmoud Salim.  Salim was a Sudanese citizen though born in Iraq and was one of the original founders of al Qaeda.  Salim was key to brokering the agreement between Bin Laden and Sudan that led to their symbiotic relationship.
As noted below, from his Sudanese base Salim helped al Qaeda establish an international support structure.

46.     Under cover of humanitarian aid programs, BIF supported the Sudan government in prosecuting a war of aggression against the non-Arab and Christian population in the southern

regions of the country. According to its own document, BIF "formed a close union with the Popular Defense Force".

47.     Sudan's militia was known as the Popular Defense Force (PDF).  Al Qaeda, fresh from the war against the Soviets in Afghanistan, trained the PDF in guerilla tactics and purchased weapons for them.  In a State Department Cable, the PDF was later praised for "fixing the spirit of jihad among the mujahidin."

48.     The Muwafaq Foundation was a Saudi-founded organization supporting al Qaeda in Pakistan, Bosnia and Sudan and was run by Yasin Kadi.  Its Khartoum office was staffed with Sudanese government employees.  In 1994, the State Department called it a 'de facto agent of the Government of Sudan.'

49.     Bin Laden praised Muwafaq for its support of the PDF in the al Qaeda supported military efforts of Sudan.  Bin Laden provided funds to Muwafaq to assist the PDF.  In one instance, Muwafaq provided 100 tanker trucks to the PDF to keep them supplied with water and fuel.

50.     Al Qaeda delegated a representative to Muwafaq to maintain adequate funding. The Khartoum office was run by a Sudanese national whose previous position had been at the Embassy of Saudi Arabia in Washington, D.C.

**The Growth of al Qaeda**

51.     In summing up al Qaeda's time in Sudan, the CIA wrote,

 "While based in Sudan from 1992-96, al-Qa'ida was transformed from an only partially realized idea to an international organization ready to operate on its own; A major factor in this development was the education al-Qa'ida members received working with officials of Sudan's National Islamic Front (NIF) to strengthen Sudan—some reporting says to build an international jihad infrastructure".

52.     Hassan al Turabi created the Popular Arab and Islamic Congress in Sudan and held conferences throughout the 1990s attended by the PLO, Hamas, Hezbollah, government representatives of Iraq, Afghanistan, Libya and Iran and militant groups from Pakistan, Algeria and Tunisia, as well as al Qaeda.

53.     During one of these conferences hosted by Turabi in Khartoum, Sudan in 1993, Osama bin Laden and a deputy met with Hezbollah and Iranian government terror chief Imad Mughniyah and Iranian Military Brigadier General Mohamed Bagr Zolqadr and struck a deal to work and train together in the safe havens of Sudan and Iran.  They established a tripartite agreement between al Qaeda, Sudan, and elements of the government of Iran and Hezbollah to work together against the United States, Israel and other western countries.  According to the CIA, this agreement was intended for al Qaeda members "to gain the necessary expertise in terrorist operations."

54.     In finding Iran liable for the September 11th Attacks, based in part on the meetings and agreements between al Qaeda and Iran that were originally brokered by Sudan, this Court found that the agreements were significant in moving al Qaeda forward and growing it into an international terrorist organization that enjoyed state support.  Prior to the Court's holding on Iran in 2011, however, other courts had already found Sudan liable for its support for al Qaeda and its role in supporting both the bombing of two U.S. Embassies in East Africa in 1998 and the bombing of the U.S.S. Cole in Yemen in 2000.  Both Sudan and Iran were, and still are, listed as state sponsors of terrorism and each were al Qaeda sponsors.

55.     Between 1990 and 1993, members of al Qaeda in Sudan undertook the task of writing the Encyclopedia of the Afghan Jihad.  The members also wrote a book on terrorism,

called Military Studies in the Jihad against the Tyrants. Both manuals were used in al Qaeda training courses.

56. Bin Laden organized al Qaeda into camps throughout Sudan, the main one being a 20-acre site near Soba, 10 kilometers south of Khartoum. Camps provided training for al Qaeda's operatives as well as training for the Sudan's Popular Defense Forces, the para-military force terrorizing the population in the south of Sudan.

57. Sudan provided 200 passports to al Qaeda so that its members could travel with new identities. Al Qaeda used these passports for two purposes: to establish an international procurement network and to support waging of jihad. At least some of these were Diplomatic Passports which allowed al Qaeda to avoid any scrutiny entering and exiting Sudan and reduced scrutiny when entering other countries.

58. Sudan was placed on the State Sponsors of Terrorism List in 1993. In order to avoid suspicion during international travel, Sudan provided a special customs service for al Qaeda operatives to avoid having Sudanese stamps placed in their passports.

59. Sudan benefited from al Qaeda's international procurement network when al Qaeda purchased communications equipment, radios, and rifles for Sudan.

60. One key al Qaeda member was Mahmdou Mahmoud Salim, who, as noted above, was a founder of al Qaeda and a key interlocutor between al Qaeda and Sudan of which he was a citizen. Salim worked with a senior NIF official to obtain communications equipment for the Sudanese intelligence service.

61. Salim was able to travel freely for al Qaeda with his Sudanese passport to attend meetings and deal with al Qaeda affairs in Turkey, Bosnia, and China.

16

62.     On September 14, 1998, the U.S. requested the extradition of Salim from Germany for conspiracy to commit the terror bombings of two U.S. Embassies in East Africa the previous month, and stated that during the period 1992-1996, while Bin Laden lived in Sudan, al Qaeda and the Sudanese government worked closely together on training and arming terrorists. While awaiting trial in the S.D.N.Y., Salim stabbed a prison guard at the M.C.C. and was later convicted of attempted murder and sentenced to life in prison.

63.     Bin Laden and al Qaeda were allowed to operate freely in Sudan, particularly for training and planning terror attacks against U.S. targets and Americans.

64.      Lieutenant General Omar Hassan Ahmed al Bashir was the President of Sudan, and as head of Sudan, Bashir was responsible for formulating and executing Sudan's policy of supporting terrorism, Bin Laden and al Qaeda.

65.     President Bashir signed a letter authorizing al Qaeda to freely pass through Sudanese customs allowing unhindered entry and exit of people and goods through Port Sudan. Bashir's letter also allowed al Qaeda free travel through police checkpoints for the transport of people and goods within Sudan.

66.     With the assistance of Sudan's intelligence service, al Qaeda smuggled weaponry into Egypt via the use of camels and from Port Sudan shipped weapons and explosives to an affiliated group in Yemen.

67.     Al Qaeda and the Sudanese Army planned the joint manufacture of chemical weapons and practiced mounting chemical agents on artillery shells. Al Qaeda at this time also began to conduct experiments on dogs that were injected or gassed with cyanide.

68.     During its stay in Sudan, al Qaeda had grown from a group of mujahidin with military experience into a full-blown terrorist organization with fund raising, propaganda, training and operations' departments.

69.     In May 1996, after the United States pressured Sudan, Bin Laden departed Khartoum and returned to Afghanistan.  The U.S. State Department called it an "alleged expulsion" and "an amicable separation."  Bin Laden continued to maintain his substantial business interests and facilities in Sudan even after his departure to Afghanistan in 1996.  As noted below, Sudan continued active and energetic support to Bin Laden and al Qaeda.

**Sudan's Support to al Qaeda attacks on the United States**

70.     In 1991, 1992, and 1993 al Qaeda issued fatwas calling for attacks on the United States.

71.     The 1992 fatwa included a call for attacks on U.S. military forces in Yemen.

72.     Al Qaeda carried out the attacks on U.S. personnel in Yemen in December 1992. Sudan knew that al Qaeda carried out this attack and supported it.

73.     The 1993 fatwa advocated violence against Americans based in Mogadishu, Somalia. Sudan's intelligence service was aware of these fatwas and supported them.

74.     In October, 1993 al Qaeda assisted the Somali warlords who shot down two U.S. Black Hawk helicopters in Mogadishu, killing 18 U.S. service members and led to the subsequent withdrawal of U.S. forces from the Somali humanitarian mission in early 1994.

75.     An April 1997 CIA report stated that al Qaeda went to Somalia "with the NIF's knowledge and encouragement, in order to kill U.S. troops, incite violence against U.S. personnel and undermine the success of the U.S. mission."

76.     Bin Laden told CNN that one of his proudest achievements during the period of time al Qaeda was based in Sudan was al Qaeda's role in the October 1993 killing of more than a dozen American soldiers stationed in Somalia who had been taking part in Operation Restore Hope, a UN-sponsored emergency relief mission.

77.     Omar Abdel Rahman, a/k/a the Blind Sheikh, was a radical Egyptian cleric who joined the jihad against the Soviet Union in Afghanistan. During the Afghan war, Abdel Rahman became very close to Bin Laden. Abdel Rahman subsequently moved to the United States. Bin Laden financially supported Abdel Rahman in New York via Sudan and NIF logistical channels. Abdel Rahman encouraged Islamic terrorist Ramzi Yousef and others to bomb the World Trade Center on February 26, 1993 killing six people. Yousef had trained in al Qaeda camps and is the nephew of al Qaeda 9/11 mastermind Khalid Sheikh Mohamed. Abdel Rahman was arrested in June 1993, four months after the WTC bombing and charged in another plot to blow up New York City landmarks known as the Bridges and Tunnels Plot or the Landmark Plot. In October, 1995 Abdel Rahman was convicted in the Southern District of New York for his role in this plot.

78.     The Sudan Embassy to the United Nations in New York and its Ambassador intended to assist Omar Abdel Rahman in this plot by arranging the entrance of a bomb-laden car into the underground parking garage of the U.N. According to the U.S. government terrorism expert who testified in the E.D.VA, Lorenzo Vidino:

> A. [I]n the follow-up operation after the ['93 World Trade Center attack, a cell made mostly of Sudanese nationals operating in the New York area, started planning a follow-up attack where the targets were the U.N., the Holland Tunnel and probably the FBI headquarters in New York. This was supposed to be, as I said, a follow-up attack to the '93 attack which, in their view, was a botched attack....

A. Phone calls were intercepted by U.S. Intelligence between some of the operatives in which they talk about the fact that officials at the Sudanese embassy were going to provide them with diplomatic passports once the operation was carried out so that they could leave the country freely the night after the attack was to take place.

At the same time for the bombing of the U.N. headquarters, the truck loaded with explosives was supposed to come in, go into the garage of the U.N. using documents provided by the Sudanese delegation. Pretty much the Sudanese delegation would write the letter and use plates. Actually the plates that were supposed to be put on the truck were plates given by the Sudanese delegation.

So there were different indications that the Sudanese delegation there was closely supporting this attempt. Two individuals that were actually directly linked to the plot were, U.S. intelligence indicated that they were actually members of Sudanese intelligence, but they were of course not identified as such at the United Nations, but were actually members of the Sudanese military intelligence.

When the U.N., the Sudanese ambassador to the U.N., who was apparently not aware that this plot was taking place, called Turabi to complain about this, Turabi pretty much told him to literally to mind his own business. So it was clear there was involvement of the highest-ranking members of the Sudanese government that had dispatched intelligence officers at the Sudanese embassy to provide support to the cell to carry out this attack in the United States. So this attack was botched, was thwarted, but it was really the final straw that led to the designation of Sudan as a state sponsor of terrorism by the United States State Department.[1]

79. As a result of these terrorist acts and plots, Sudan was designated in 1993 as a

foreign state that sponsors terrorism within the meaning of the Export Administration Act of

1979, 50 U.S.C. App. §2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371(b) and

28 U.S.C. §2333.

---

[1] Testimony of Lorenzo Vidino, *Rux v. Republic of Sudan*, Case No. 2:04-cv-0428, (E.D.Va.), March 13, 2017, at pp. 90-91.

80.     In May 1996 Bin Laden left Sudan for Afghanistan. The U.S. State Department

called it an "alleged expulsion" and said "Bin Ladin's National Islamic Front colleagues probably

would have wanted an amicable separation, in part because Khartoum did not want to alienate

the radical terrorist financier and his small army of trained mujahidin. Any arrangement may

have included allowing bin Ladin to run his Khartoum-based businesses through Sudanese

intermediaries."

81.     In August 1996, Bin Laden and al Qaeda issued a public Declaration of Jihad

calling for attacks on the United States.

### 1998 Bombing of U.S. Embassies in East Africa

82.     In early 1998, several of the principal operatives in this al Qaeda bombing plot

travelled back and forth between Khartoum and Nairobi, the site of one of the U.S. Embassy

attacks.  On August 7, 1998, al Qaeda operatives carried out near simultaneous truck bombings

of the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing 224 people,

including 12 Americans, and injuring over 4,500.

83.     Sudan assisted al Qaeda in carrying out the planning and execution of the 1998

bombings of the U.S. Embassies in Kenya and Tanzania.  Beginning in 1993, al Qaeda

dispatched its operatives from Sudan to Kenya to begin setting up the logistical network

necessary to surveil, plan and carry out the attacks.  In 1997, funding in U.S. dollars for the

Embassies' bombing plot was transferred from Sudan to al Qaeda operatives with the assistance

of Sudanese authorities.   The operatives used Sudan as their home base and held Sudanese

passports and documents issued by the Sudanese government that allowed them to freely cross

international borders.

84.     In the aftermath of the Embassy attacks, Sudan's President Bashir defended Osama bin Laden. "I met him. . . He's a very normal person who is very religious."

85.     On August 20, 1998, "To preempt additional attacks, the United States launched military cruise missile strikes against terrorist targets in Afghanistan and Sudan." One of those targets was a Sudanese government chemical factory north of Khartoum.

86.     Several Al Qaeda terrorists were eventually captured, prosecuted and convicted in the S.D.N.Y, including Osama bin Laden in absentia. Many of the bombing victims and their survivors brought civil suits against al Qaeda, Sudan and others. Sudan hired counsel in the action but later abandoned the litigation. The D.C. District granted a default judgment against Sudan and conducted an evidentiary hearing. The court found that Sudan provided material support to al Qaeda and was responsible for the bombings of the two U.S. Embassies in East Africa. The D.C. Circuit Court of Appeals affirmed the District Court in Owens v. Republic of Sudan, 864 F.3d 751, 794-95 (D.C. Cir. 2017), finding that Sudan was responsible for supporting the al Qaeda bombings:

> The record shows that after al Qaeda started its businesses, Sudan fostered their growth through tax exceptions and customs privileges. This allowed al Qaeda nearly to monopolize the export of several agricultural commodities, plowing its profits back into its broader organization. Again, after al Qaeda opened its training camps, Sudanese intelligence shielded their operations from the local police despite complaints from nearby residents. This preferential treatment certainly qualifies as material support, even if Sudan played no role in creating the underlying businesses and training camps.

87.     The D.C Court of Appeals further stated that:

The district court noted, bin Laden's $50 million investment in the partially state-owned al Shamal Islamic Bank gave al Qaeda "access to the formal banking system," which proved useful for "laundering money" and "financing terrorist operations." 826 F.Supp. 2d 128, at 144. Al Qaeda operatives, including bin Laden himself, held accounts in their real names in al Shamal bank, demonstrating the impunity with which the group operated in Sudan. Id. at p.795.

88.    In summarizing Sudan's deep and long-lasting relationship with al Qaeda, the

D.C. Court of Appeals found that:

> The plaintiffs have offered sufficient admissible evidence that establishes that Sudan's material support of al Qaeda proximately caused the 1998 embassy bombings.

89.    The issue of punitive damages and its retroactive application was challenged by

Sudan and its on-again, off-again U.S. counsel at White & Case, and certiorari was granted.  In

May 2020, the Supreme Court not only unanimously sustained the judgment against Sudan for

the embassy bombings, but also determined that Congress could, and ultimately did, legislate

that punitive damages against a sovereign state in a terror action were permitted.  Opati v.

Republic of Sudan, 590 U.S. p. 5 (May 2020).  Justice Gorsuch wrote that:

> "District Judge John Bates offered detailed factual findings explaining that Sudan had knowingly served as a safe haven near the two United States Embassies and allowed al Qaeda to plan and train for the attacks. The court also found that Sudan had provided hundreds of Sudanese passports to al Qaeda, allowed al Qaeda operatives to travel over the Sudan-Kenya border without restriction, and permitted the passage of weapons and money to supply al Qaeda's cell in Kenya. See Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 139–146 (DC 2011)."

**2000 Bombing of U.S.S. Cole**

90.    Two years later, the U.S.S. Cole was bombed by al Qaeda in the port of Sanaa,

Yemen in October 2000.  One of the main architects of the bombing trained in the al Qaeda

camps in Sudan.

91.    On July 25, 2007, in finding Sudan liable for the Cole bombing, the Federal Court

in the Eastern District of Virginia, after weighing trial evidence stated, "the Court FINDS as a

fact, that the explosives used in the Cole attack were sent by Al Qaeda operatives in Sudan."

92.    The Court further stated that,

"[t]his finding is corroborated by the testimony of one of Bin Laden's lieutenants in

Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising

out of the 1998 embassy bombings. (Ex. 32, *United States v. Bin Laden,* Case No. 198CR1023, Trial Tr. Feb. 6, 2001). Mr. Al-Fadl stated in sworn testimony in a trial before the United States District Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese military in Port Sudan to Yemen, where they were to be used to "fight the Communists."

93.    The Virginia District Court further found that:

"Based on the expert testimony and documentary evidence, the Court FINDS as a fact that Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to transform into a sophisticated, worldwide terrorist network, and that such support was critical to Al Qaeda developing the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack that killed the seventeen American sailors on the U.S.S. Cole. Each of the expert witnesses testified that the strike against the Cole would likely not have occurred without Sudan's support and assistance to Al Qaeda in the form of safe haven, military training, diplomatic passports, business partnerships, and lax banking and accounting systems that facilitated money laundering." *Rux* at 553.

94.    In addition, the Rux Court stated that,

"[t]he Court FINDS as a fact by substantial evidence that Sudan's material support to Al Qaeda led to the murders of the seventeen American servicemen and women on October 12, 2000, in the territorial waters of Yemen." *Id*. at 554.

95.    Relying on exceptions to foreign sovereign immunity pre-JASTA, the District

Court held that:

"Sudanese Government officials, employees, or agents acting within the scope of their office provided various forms of "material support" as defined in 18 U.S.C. § 2339A(b), including lodging, safe houses, financial services, false documentation, and transportation, to Al-Qaeda, whose operatives planned and carried out the Cole bombing. *See* 18 U.S.C. § 2339A(b)(1) (defining "material support or resources").[10] The deliberate murder of the seventeen American sailors qualifies as an "extrajudicial killing."[11] Jurisdictional causation under 28 U.S.C. § 1605(a)(7) is satisfied, as the evidence establishes a "reasonable connection between [Sudan's] provision of material support to [Al Qaeda] and the damage arising out of [the] terrorist attack" against the Cole. *Rux,* 461 F.3d at 473. Since 1993, the U.S. Department of State has designated Sudan as a state sponsor of terrorism in accordance with § 6(j) of the Export Administration Act, 50 U.S.C. § 2405(j). 58 Fed.Reg. 52523-01 (Oct. 8, 1993). Id. at 554-55.

96.     The USS Cole bombing took place on October 12, 2000, after the 9/11 hijackers had already begun arriving in the United States in preparation for the attack that would take place a mere 11 months later.

**Sudan's Support of the 9/11 Attack**

97.     According to the Report of the 9/11 Commission, the first planning for the 9/11 Attacks took place at the al Qaeda headquarters in Khartoum, Sudan.

98.     From 1996 to 1998, numerous telephone calls were made to the Khartoum offices of the al Qaeda companies from al Qaeda telephones in London, Kenya and Afghanistan.

99.     In its December 4, 1998 daily briefing of the President, the CIA wrote "A Bin Ladin associate in Sudan late last month told a colleague in Kandahar that he had shipped a group of containers to Afghanistan. Bin Ladin associates also talked about the movement of containers to Afghanistan before the East Africa bombings."

100.    According to the Canadian Intelligence Service, in a 1998 meeting with al Qaeda's number two official, Ayman al Zawahiri, Sudanese government officials agreed to use their embassies in western capitals to act as fund-raisers for al Qaeda and to provide passports to al Qaeda to further al Qaeda's terrorist agenda and the ability of its operatives to move about the globe.

101.    As noted above, the Islamic African Relief Agency (IARA), an NIF charity based in Khartoum with fund raising subsidiaries in many countries including the United States, has long supported al Qaeda and Bin Laden.

102.    In 1999, IARA's overseas offices provided hundreds of thousands of dollars to Bin Laden. For instance, IARA's office in Dublin, Ireland was raided in 2001 and documents

recovered related to Mustafa al Hawsawi and the al Qaeda network.  Al Hawsawi was a major

source of funds for the 9/11 hijackers.  IARA Dublin provided support to the European based

cell of al Qaeda during the same time that al Qaeda recruited the 9/11 hijackers in Hamburg,

Germany and other parts of Europe.  The Director of IARA Dublin visited Afghanistan in the

year 2000 to facilitate the flow of money and support to al Qaeda terrorists in Afghanistan and

Europe.

      103.    In 2000, representatives of IARA Afghanistan and al Qaeda's main support group

Mahktab al Khidmat, traveled to Sudan and neighboring countries on a fundraising trip, in which

they raised $5 million for al Qaeda.  Outside of Afghanistan, government officials in Sudan and

Saudi Arabia provided critical financial and logistical support to al Qaeda as the organization

was conducting the final phases of training for the 9/11 Attack.  The Director of IARA

Afghanistan was a top aide to Bin Laden. During the year 2000, from its base in Afghanistan, al

Qaeda directed the financial support to the 9/11 Plot.

      104.    IARA had representatives in several U.S. cities. One representative, Ziyad Khalil,

procured a satellite phone for the use of Osama Bin Laden in Afghanistan.  Another IARA

representative, Ahmed Al-Hebr, was based in the King Fahad Mosque in Culver City, California.

Al-Hebr had helped organize the Grand Opening of the mosque in 1998.  Out of the fifty

mosques operating in Southern California in January 2000, hijackers Nawaf al Hazmi and Khalid

al Mihdhar went to this mosque upon their arrival in the U.S, and received assistance from the

mosque management.  On October 13, 2004, the U.S. government listed IARA as a Specially

Designated Global Terrorist ("SDGT") entity, along with five senior officials for providing

direct support to bin Laden and al Qaeda.

105.    As stated above, after Bin Laden left Sudan in May 1996, Saudi businessman and charitable supporter of al Qaeda, Adel Batterjee, became the Chairman of al Shamal Islamic Bank, despite his having no prior banking or financial experience.  His charity, the Benevolence International Foundation (BIF), which supported both al Qaeda and Sudan, became the largest shareholder in the bank.

106.    A document recovered from the 2011 raid on Bin Laden's Abbottabad compound revealed that in 1999, Bin Laden declared that he had between 26 and 28 million dollars still left in Sudan and was attempting to find a way to access the funds from Afghanistan. One of the money laundering mechanisms used to access these funds is described below.

107.    As detailed above, Rowad Development was an agricultural joint venture owned by Bin Laden, al Qaeda, Saudi businessman Yasin Kadi, and al Shamal Islamic Bank. Sudan's Minister of Finance was on the Board of Directors. One of its primary commodities was sesame for which Sudan gave al Qaeda a monopoly on exports. In 1999-2000, several of the principals involved in Rowad continued the trade in sesame from Sudan, albeit under a different corporate name, in order to provide funding and cover for al Qaeda operatives.

108.    During the summer of 1999, using about $1 million originating from the Saudi Royal Family, a newly established company named Solano was formed by Rowad shareholders to ostensibly purchase sesame seeds in Sudan in order to market them internationally.

109.    In 1999-2000, Solano bought sesame seeds from a related Sudanese company, Adyat.  To pay for the sesame seeds, Solano transferred approximately $1 million from its Swiss bank account to Adyat's account in al Shamal Bank via Dubai Islamic Bank.  The funds were then transferred on to the Farmers Commercial Bank, another Sudanese bank founded by Bin

27

Laden and the NIF. The Farmers Commercial Bank was a US Treasury Designated National at the time of the transfers.

110.     An intermediary company in these transactions was Dan Fodio, a Sudanese company owned by the National Islamic Front which helped al Qaeda trade in sesame seeds at the time al Qaeda had a 'near monopoly' on export of sesame products. In May 2000, 1,000 tons of sesame seeds were exported from Port Sudan but Solano records do not show any revenue from the sale of these sesame seeds.

111.     Simultaneously, Solano itself held an account at al Shamal.  The account began with a balance of $9 million, though there is no indication of the origin of these funds.  Between October 1999 and February 2000, in a series of transactions, al Shamal drained the Solano account to zero.  An additional thirty-four checks totaling $27 million were presented for payment but according to al Shamal records, there were insufficient funds to cover the checks. The figure is nearly identical to the $26-28 million Bin Laden wanted to extract from Sudan as noted above.

112.     As the State Department said in a cable of June 20, 2000, "Several Bin Ladin businesses . . . are run by al-Qaida lieutenants and still operate in Sudan. . . Sudan maintains a financial stake in some of these companies and has tried to obscure Bin Ladin's commercial ties by changing the name of at least one of his companies."  In the summer of 2000, on several occasions the United States Department of State noted that Sudan continued to knowingly allow al Qaeda staff and corporate entities to function within its borders.

113.     Abdelrahim Mohamed Hamdi was Sudan's Minister of Finance in 1991 and was instrumental in raising funds, including from Bin Laden, to capitalize al Shamal Islamic Bank. Hamdi was also the Chair of the Khartoum Stock Exchange and Chair of the National

Committee for the Division of National Wealth in the late 1990s.  In early 1996, Abdelwahab Osman was appointed Sudan's Minister of Finance.  Osman was also Chairman of the al Shamal Islamic Bank and a Board Director of Rowad Development.  Hamdi and Osman had regulatory authority over all banks in Sudan as well as controls on foreign exchange.

114.    These two fund-raising schemes on behalf of al Qaeda by IARA and Solano took place simultaneously with al Qaeda's major expenditures on the 9/11 Plot.

115.    The funds generated by Sudan were critical to al Qaeda's 9/11 Plot by supporting al Qaeda's training camps in Afghanistan which the 9/11 hijackers attended, the infrastructure of al Qaeda in Afghanistan, Pakistan and other countries necessary for the 9/11 Plot to be carried out, the travel, living, and the training expenses of the hijackers and their supporters as they moved overseas in preparation for the attack.

116.    In describing Sudan's relations with al Qaeda after the departure of Bin Laden, an official of the US State Department's Bureau of Intelligence and Research reported, after 1996 "there were still persistent links with Al Qaida. The facilitators were still in Khartoum and . . . Sudanese government officials knew it. Al Qa'ida front companies were still in play. . . . Sudan was trying to give the impression that they were changing without surrendering Islamic radicals. They were trying to have it both ways."

117.    In another cable, the United States Department of State noted they had a "list of 26 associates of Bin Laden who continue to reside in Sudan."

118.    The United States Department of State issues annual reports titled Patterns of Global Terrorism.  The 1998 annual report stated "Sudan continued to serve as a meeting place, safe haven, and training hub for a number of international terrorist groups, particularly Usama Bin Ladin's al-Qaida organization."  The 1999 annual report stated "Sudan continued to serve as

29

a meeting place, safe haven, and training hub for members of Bin Ladin's al-Qaida, Lebanese

Hezbollah, al-Jihad, al-Gama 'at, PIJ, HAMAS, and the Abu Nidal organization (ANO)." The

2000 annual report noted that Sudan "continued to be used as a safe haven by members of various

groups, including associates of Usama Bin Ladin's al-Qaida organization, Egyptian al- Gama'a al-

Islamiya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and HAMAS. Most groups used

Sudan primarily as a secure base for assisting compatriots elsewhere." The 2001 report, issued a

few months after the September 11th attack, stated, "[a] number of intentional terrorist groups

including al-Qaida, the Egyptian Islamic Jihad, Egyptian al-Gama'a al-Islamiya, the Palestine

Islamic Jihad, and Hamas continued to use Sudan as a safe haven, primarily for conducting

logistics and other support activities."

119.   The United States Secretary of State continues to designate the Republic of Sudan

as a state sponsor of international terrorism.


### FIRST CAUSE OF ACTION TO RECOVER PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO SECTION 1605A OF THE FOREIGN <u>SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605A</u>

120.   Plaintiffs incorporate herein by reference the averments contained in the

preceding paragraphs as though fully set forth herein at length.

121.   At all relevant times, defendant Sudan was and remains to be a foreign state

designated as a state sponsor of terrorism as required by 28 U.S.C. § 1605A(a)(2)(A)(i) to

maintain an action under § 1605A of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.

§ 1605A(a)(2)(A)(i).

122.     Plaintiffs herein initially brought suit against defendant Sudan pursuant to 28

U.S.C. § 1605(a)(7) and Pub.L. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172 (reprinted

at 28 U.S.C. § 1605 note (West Supp.)).

123.     Congress, in the National Defense Authorization Act for Fiscal Year 2008 (P.L.

110-181, § 1083), which was enacted January 29, 2008 (the "NDAA"), amended the Foreign

Sovereign Immunities Act ("FSIA") by adding a new § 1605A to Chapter 97 of Title 28 of the

U. S. Code. The new Section 1605A unequivocally creates a federal private right of action

against foreign state sponsors of terrorism.  Subsection (c) of § 1605A, provides:

> **(c) Private right of action.**--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--
>
> > **(1)** a national of the United States,
> >
> > **(2)** a member of the armed forces,
> >
> > **(3)** an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
> >
> > **(4)** the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

Section 1605A applies to the pending actions of each of the Plaintiffs herein pursuant to Pub.L.
110-181, Div. A, Title X, § 1083(c), Jan. 28, 2008, 122 Stat. 342, which provides that**:**

> **(1) In general.**--The amendments made by this section [enacting this section and amending 28 U.S.C.A. §§1605, 1607, 1610, and 42 U.S.C.A. § 10603c] shall apply to any claim arising under section 1605A of title 28, United States Code [this section].
>
> * * *

**(3) Related actions.**--If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code [this section], if the action is commenced not later than the latter of 60 days after--

    (A) the date of the entry of judgment in the original action; or

    (B) the date of the enactment of this Act [Jan. 28, 2008].

124.    As a result of the conduct of defendant Sudan and its agencies, instrumentalities, officials, employees and agents that violated the federal laws cited above, all Plaintiffs suffered damages as fully set forth in the paragraphs herein which are incorporated here by reference.

125.    The surviving personal injury and death victims were seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental and emotional pain and injury and they were rendered sick, sore, lame and disabled, and were otherwise injured or killed, or were confined to a hospital, bed, and/or home for a period of time. Those surviving personal injury victims and the estates of those killed are entitled to recover damages from defendant Sudan for their personal injuries and deaths sustained in and as a result of the September 11, 2001 terrorist attacks.

126.    Decedents killed in the September 11, 2001 terrorist attack are survived by family members entitled to recover damages from defendant Sudan for wrongful death. These family members are among the Plaintiffs who are entitled to damages deemed as a fair and just compensation for the injuries resulting from the deaths of the Decedents.

127.    The injuries and damages suffered by the Plaintiffs by virtue of personal injury and wrongful death, and the consequences resulting there from, were proximately caused by the intentional, reckless and negligent acts, omissions, and other tortious conduct of defendant Sudan as described herein.

128.    As a direct and proximate result of intentional, reckless and negligent acts, omissions, and other tortious conduct of defendant Sudan, the surviving personal injury plaintiffs suffered serious and permanent personal injuries, severe mental and emotional anguish and suffering, impairment of their respective earning capacities, which impairment will continue indefinitely into the future, as well as financial losses and expenses, were obligated to receive and undergo medical attention and care and to incur various expenses for the treatment of their injuries.

129.    As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of future aid, assistance, services, comfort, and financial support and suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

130.    Plaintiffs also bring this action for damages suffered by the Decedents and caused by the defendant's conduct.  As a result of the intentional, reckless and negligent acts of defendant Sudan as described above, the Decedents endured pain, suffering, and trauma; were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their ultimate deaths.

131.    The actions of defendant Sudan, its agencies, instrumentalities, officials, employees and agents, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of all the Plaintiffs.  The defendant intended to carry out actions that would end the lives of the Decedents.

33

132.     As a result of their intentional, malicious, outrageous, willful and wanton conduct, all defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against defendant Sudan jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, together with punitive damages, plus pre- and post-judgment interest, costs, attorney fees, and such other monetary and equitable relief as this Honorable Court deems appropriate under the circumstances and to prevent Sudan from ever again committing such heinous acts.

## SECOND CAUSE OF ACTION TO RECOVER PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO SECTION 1605B OF THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605B (JASTA) AND THE ANTI-TERRORISM ACTS

133.     Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth herein.

134.     This action is also brought pursuant to 28 U.S.C. § 1605B of the Foreign Sovereign Immunities Act known as JASTA and 18 U.S.C. § 2333(a) for the injuries and deaths suffered by U.S. nationals in the September 11th Attacks.

135.     Those attacks constituted acts of international terrorism pursuant to JASTA and 18 U.S.C. §2331 that violated federal and state laws against murder, kidnapping, assault and aircraft hijacking, including but not limited to 18 U.S.C. §2332b (prohibiting terrorist acts of kidnapping, assault and murder) and 49 U.S.C. §46502 (prohibiting aircraft hijacking), and at the time those acts were committed, planned and authorized, al Qaeda was designated as a Foreign Terrorist Organization under section 219 of the Immigration and Nationality Act, 8 U.S.C. §1189.

34

136. Pursuant to 18 U.S.C. §2333(a), (d), Sudan aided and abetted al Qaeda through numerous acts detailed herein by knowingly providing it with substantial assistance to prepare and carry out an act or acts of international terrorism.

137. Pursuant to 18 U.S.C. §2333(a), (d), Sudan conspired with al Qaeda and others to provide it with substantial material support and resources, with the shared understanding, knowledge and intent that said support and resources would be used by al Qaeda to prepare and carry out an act or acts of international terrorism.

138. The others in the conspiracy currently known to plaintiffs are named herein, and include Sudan's officials, employees and agents, Sudan's banks, businesses and charity organizations, Osama Bin Laden and al Qaeda operatives; the names of additional persons involved in the conspiracy await discovery and further investigation.

139. Pursuant to §2333(a), Sudan committed an act or acts of international terrorism, as defined in 18 U.S.C. § 2331(1)(A), in violation of federal and state criminal laws, or that would have been a criminal violation if committed within the United States or any state, including but not limited to a violation of the following:

- 18 U.S.C. §2(a) – Aiding, abetting, counseling, commanding, inducing or procuring a federal crime;
- 18 U.S.C. §371 – Conspiring to commit a federal crime;
- 18 U.S.C. §2332 – Conspiring to attempt to kill or kill a U.S. national;
- 18 U.S.C. §2332a – Conspiring to use a weapon of mass destruction;
- 18 U.S.C. §2332b – Conspiring to commit an act of terrorism;
- 18 U.S.C. §2339A – Providing material support to terrorists;
- 18 U.S.C. §2339B – Providing material support or resources to designated foreign terrorist organizations;
- 18 U.S.C. §2339C – Prohibitions against the financing of terrorism;
- 49 U.S.C. §46502 – Conspiring to commit aircraft piracy;
- N.J.S.A. §2C:2-6 – Accomplice liability;
- N.Y. Penal Law §20.00 – Criminal liability for conduct of another;
- N.Y. Penal Law §115.00 – Criminal facilitation in the fourth degree;
- Mass. Gen. Laws ch. 274, §2 – Accessory or aiding in the commission of a felony;
- 18 Pa. C.S. §306 – Accomplice liability; and

- Va. Code Ann. §18.2-18 – Accessory before the fact.

140.     Sudan's conduct amounted to a violation of 18 U.S.C. §2(a) because Sudan intentionally aided, abetted and counseled the commission of a criminal act or acts of international terrorism by al Qaeda, by providing the terrorist organization with material support, resources and funding with the knowledge that al Qaeda would use such assistance to prepare for and commit such a criminal act or acts.

141.     Sudan's conduct amounted to a violation of 18 U.S.C. §371 because it conspired with al Qaeda and others to provide it with substantial material support and resources with the shared understanding, knowledge and intent that said support and resources would be used by al Qaeda to prepare for and carry out a criminal act or acts of international terrorism.

142.     Sudan's conduct amounted to a violation of 18 U.S.C. §2339A in that on and prior to September 11, 2001, it provided material support or resources for al Qaeda and/or conspired with al Qaeda and others to provide material support or resources for al Qaeda, with the knowledge or intent that they would be used in preparation for, or in carrying out a violation of the statutes specified in 18 U.S.C. §2339A, including 18 U.S.C. §2332b (prohibiting terrorist acts of kidnapping, assault and murder) and 49 U.S.C. §46502 (prohibiting aircraft hijacking).

143.     Sudan's conduct amounted to a violation of 18 U.S.C. § 2339A in that on and prior to September 11, 2001, it concealed or disguised the nature, location, source, or ownership of al Qaeda's material support or resources and/or conspired with Sudan's intelligence apparatus, military, police, border and customs officials, government officials, employees and agents, Sudan's banks, businesses, charity organizations, al Qaeda, al Qaeda operatives and sympathizers and others, known and unknown, to conceal or disguise the nature, location, source or ownership of al Qaeda's material support or resources, with the knowledge or intent that they

36

would be used in preparation for, or in carrying out a violation of the statutes specified in 18

U.S.C. §2339A, including 18 U.S.C. §2332b (prohibiting terrorist acts of kidnapping, assault and

murder) and 49 U.S.C. §46502 (prohibiting aircraft hijacking).

144.    Sudan's conduct amounted to a violation of 18 U.S.C. §2339B in that on and prior

to September 11, 2001, it knowingly provided material support or resources to al Qaeda, and/or

Sudan conspired to knowingly provide material support or resources to al Qaeda with Sudan's

intelligence apparatus, military, police, border and customs officials, government officials,

employees and agents, Sudan's banks, businesses, charity organizations, employees and agents,

al Qaeda, al Qaeda operatives and sympathizers and/or others, known and unknown, with the

knowledge that al Qaeda was a designated Foreign Terrorist Organization, has engaged or

engages in terrorist activity or has engaged or engages in terrorism.

145.    Sudan's conduct amounted to a violation of 18 U.S.C. §2339C in that on and prior

to September 11, 2001, as detailed within, it provided safe haven and training camps, introductions

and meetings with other established terror organizations, military and terror training, passports and

other travel documents, weapons and explosives, recruitment screening, intelligence information,

and provided or collected funds for al Qaeda and/or conspired with Sudan's intelligence

apparatus, military, police, border and customs officials, government officials, employees and

agents, Sudan's banks, businesses, charity organizations, al Qaeda, al Qaeda operatives and

sympathizers and others, known and unknown, to provide or collect funds for al Qaeda, with the

intention that such funds be used, or with the knowledge that such funds were to be used, in full or

in part, to carry out an act or acts of international terrorism.

146.     Sudan's conduct amounted to a violation of relevant state criminal laws on facilitating, aiding and abetting a crime, and conspiracy, including but not limited to those cited above, in that it:

a.     intentionally aided, abetted and counseled al Qaeda by providing it with material support, resources and funding with the knowledge that al Qaeda would use such assistance to commit an act or acts of international terrorism; and/or

b.     believing it was probably rendering aid in the form of material support or resources and funds to al Qaeda to engage in a crime, provided al Qaeda with the means or opportunity for the commission thereof and which in fact aided al Qaeda to commit the September 11th Attacks; and/or

c.     conspired with Sudan's intelligence apparatus, military, police, border and customs officials, government officials, employees and agents, Sudan's banks, businesses, charity organizations, al Qaeda, al Qaeda operatives and sympathizers and others known and unknown, to violate relevant state criminal laws on facilitating and aiding and abetting a crime and committing an act or acts of terrorism, including assault, hijacking, kidnapping and murder.

147.     As detailed herein, the aforesaid act or acts of international terrorism:

a.     involve a violent act or acts dangerous to human life, as demonstrated by the known and foreseeable outcomes of injury and death resulting from providing substantial assistance to al Qaeda terrorists;

b.     were committed primarily outside the territorial jurisdiction of the United States and also transcended national boundaries in terms of the means by which they were accomplished, the persons they appear intended to intimidate or coerce, and the locales in which their perpetrators operated; and

c.     appeared to be intended to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or, to affect the conduct of a government by mass destruction, kidnapping or assassination.

148.     The aforesaid acts of Sudan were not mere negligence, but each act individually and/or in combination with one or more acts constituted conduct that was intentional, reckless, willful and/or grossly negligent and each of those acts individually and/or in combination with one or more of those acts was a proximate cause of the September 11th Attacks and the resulting injuries and deaths of plaintiffs' decedents.

149.     The September 11th Attacks could not have occurred absent the knowing and substantial assistance provided to al Qaeda by Sudan.  Those attacks and resulting injuries and deaths were a natural, probable and reasonably foreseeable consequence of Sudan's conduct.

150.     As a result, Sudan is liable to plaintiffs for all damages resulting from the injuries and deaths in the September 11th Attacks.

151.     Plaintiffs, the surviving family members of each decedent, the decedents and their Estates have suffered and will continue to suffer past and future damages as a result of the injuries and deaths sustained in the September 11th Attacks, including but not limited to: personal injury damages, wrongful death damages, survival damages, economic damages, pecuniary loss, non-economic damages, pain and suffering, torture, imprisonment, kidnapping, fear of impending death, physical trauma, mental anguish, mental distress, grief, loss of enjoyment of life, loss of earnings, financial support, services, companionship, care, guidance, consortium, solatium, burial costs, medical and other expenses and other provable damages allowed by law.

WHEREFORE, plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death, all recoverable losses under 28 U.S.C. §1605B and18 U.S.C. §2333 and other appropriate relief be entered on their first cause of action in favor of the plaintiffs individually and as estate representatives and against the defendant Sudan and other named Sudanese defendants, with separate awards for each plaintiff, where appropriate, plus interest, costs, punitive damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO STATE TORT LAW

152. Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth herein.

153. On March 10, 2004, a class action complaint seeking damages for a class defined as the spouses, children, parents, siblings and legal representatives of those individuals killed in the September 11th Attacks (excluding the 19 hijackers) was timely filed against Sudan and others under the caption, *O'Neill v. Kingdom of Saudi Arabia, et al*, 04-CV-01922 (GBD), and new complaint *O'Neill v. Republic of Sudan*, 18-CV-12114 (GBD) also naming Sudan as a defendant requesting class certification and updating the cause of actions based on changes in the law under the FSIA and ATA. The *O'Neill* case currently remains pending before this Court.

154. *O'Neill* asserted state tort law claims against Sudan for causing the deaths of plaintiffs' decedents in the September 11th Attacks, including claims for wrongful death, survival, aiding and abetting, conspiracy and negligence, including intentional, knowing, reckless, willful, wanton, grossly negligent and/or negligent tortious acts and omissions.

155.    Plaintiffs herein include members of the class defined in *O'Neill*, but to date no determination regarding class certification has been made by this Court.

156.    This cause of action is brought before that determination and plaintiffs present these state tort law claims to assert and protect their rights to pursue such claims, for example, in the event that the *O'Neill* class is not certified by this Court.

157.    Pursuant to the doctrine first declared by the Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the time for plaintiffs who are members of the *O'Neill* class to bring their state law claims has been tolled from the date the *O'Neill* action was brought until this Court makes its determination on class certification.

158.    For years prior to and including September 11, 2001, Sudan, through its officials, officers, employees, agents and others, participated and associated with al Qaeda in its terrorist agenda as set forth herein; provided al Qaeda and its hijackers with substantial material support, financing and resources; knew that it was assisting a terrorist organization that had conducted and was actively planning attacks against the United States; and committed tortious acts and omissions that were intentional, knowing, reckless, willful, wanton, grossly negligent and/or negligent.

159.    Sudan's conduct was a proximate cause of the deaths, injuries and resulting damages suffered by plaintiffs, as it furnished the essential support networks, cover and funding used by al Qaeda to successfully plan and execute the September 11th Attacks.

160.    Sudan tortiously conspired, aided and abetted al Qaeda by providing substantial assistance in the form of funding, support and resources to al Qaeda and its hijackers with the knowledge that they planned to use such assistance to prepare for and conduct terrorist attacks

against the United States and its citizens and/or with reckless disregard of the known probable

risk that such assistance would be used for those terrorist purposes.

161.    Sudan tortiously conspired with al Qaeda and others to provide al Qaeda and its

hijackers with substantial material support and resources, with the shared agreement,

understanding, knowledge and intent that said support and resources would be used by al Qaeda

to plan and carry out terrorist acts against the United States.

162.    For years prior to and including September 11, 2001, Sudan knew that its officers,

employees and agents, and Sudan's charitable organizations were engaging in illegal and/or

criminal activity by using Sudan's offices, equipment and other resources to provide substantial

material support and resources to al Qaeda and, that Sudan's officers, employees and agents,

were al Qaeda operatives or sympathizers who were using their government positions to provide

substantial assistance to al Qaeda.

163.    Despite such knowledge, Sudan intentionally and/or recklessly and/or carelessly

failed to properly supervise its officers, employees and agents and Sudan's charitable

organizations to stop them from using Sudan's offices, equipment and other resources to provide

substantial assistance to al Qaeda despite the known and/or foreseeable risk that such assistance

was being used by al Qaeda to prepare and conduct a terrorist attack against the United States

and its citizens.

164.    Moreover, Sudan intentionally and/or recklessly and/or carelessly selected, hired

and retained as its officers, employees, agents and various individuals, who Sudan knew and/or

should have known, were al Qaeda operatives or sympathizers, despite the known and/or

foreseeable risk that those employees and agents would use and/or were using their government

positions to provide substantial assistance to al Qaeda to prepare and conduct a terrorist attack against the United States and its citizens.

165.     The aforesaid intentional, criminal, knowing, reckless, willful, wanton, grossly negligent and/or negligent acts and/or omissions of Sudan were individually and/or in combination with one or more of those acts and/or omissions a proximate, substantial cause of the September 11th Attacks and the plaintiffs' injuries, deaths and resulting damages.

**WHEREFORE**, plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death and other appropriate relief be entered on their second cause of action in favor of the plaintiffs individually and as estate representatives and against the defendant Sudan and other Sudanese defendants, with separate awards for each plaintiff, where appropriate, plus interest, costs, punitive damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

### FOURTH CAUSE OF ACTION FOR PERSONAL INJURY AND WRONGFUL DEATH DAMAGES PURSUANT TO THE ALIEN TORT CLAIMS ACT

166.     Plaintiffs repeat and reallege all of the preceding paragraphs as if fully set forth herein.

167.     *O'Neill* asserted claims under the Alien Tort Claims Act against Sudan for causing the deaths of plaintiffs' decedents in the September 11th Attacks based on violations of international law resulting in injury and death in the September 11th Attacks.

168.     Plaintiffs herein include members of the class defined in *O'Neill*, but to date no determination regarding class certification has been made by this Court.

169.    This cause of action is brought before that determination and plaintiffs present these Alien Tort Claims Act claims to assert and protect their rights to pursue such claims, for example, in the event that the *O'Neill* class is not certified by this Court.

170.    The Alien Tort Claims Act, 28 U.S.C. §1350, allows aliens to sue for torts committed in violation of the law of nations, international law or a treaty of the United States.

171.    The conduct of Sudan as detailed herein to provide substantial material support, resources and sponsorship for al Qaeda and its acts of international terrorism resulting in the September 11th Attacks constitutes a clear violation of the law of nations and international law, which includes international legal norms prohibiting crimes against humanity, mass murder, genocide, torture, extrajudicial killing, air piracy, financing of terrorism, and terrorism, which can be found in and derived from, among other things, the following conventions, agreements, U.N. declarations and resolutions, and other documents:

(1)    Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

(2)    Allied Control Council Law No. 10 (Dec. 20, 1945);

(3)    Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, 78 U.N.T.S. 277;

(4)    Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

(5)    Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)    International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7)    International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force Apr. 10, 2002);

(8)    U.N. Security Council Resolution 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999);

(9)    U.N. Security Council Resolution 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001);

(10)   Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11)   Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

(12) Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13) The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112l;

(14) The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15) The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

172. Sudan's conduct was a substantial cause of the September 11th Attacks and the plaintiffs' injuries, deaths and resulting damages.

**WHEREFORE**, plaintiffs pray that judgment(s) for relief in the form of an award or awards of monetary damages for personal injury, wrongful death and other appropriate relief be entered on their third cause of action in favor of the plaintiffs individually and as estate representatives and against Sudan, with separate awards for each plaintiff, where appropriate, plus interest, costs, punitive damages, treble damages, attorney's fees, and such other relief as the Court deems just and proper.

### FIFTH CAUSE OF ACTION FOR PUNITIVE DAMAGES

173. Plaintiffs reallege the above paragraphs as if fully set forth herein. For the reasons stated above, and pursuant to § 28 U.S.C. § 1606, Sudan is liable jointly and severally, to each plaintiff for punitive damages.

## SIXTH CAUSE OF ACTION FOR
## PROPERTY DAMAGE

174.     Plaintiffs re-allege the above paragraphs as if fully set forth herein. As a direct and proximate result of defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, defendants have caused property damage plaintiffs severe and extensive damage in that their building became blighted; physical damage was caused to the building by parts of the World Trade Center which struck the building; asbestos and other materials from the World Trade Center struck plaintiffs' building; the building had become unsafe until the asbestos has been cleaned up; plaintiffs were required to perform extensive asbestos clean-up and clean- up for other toxic materials from the World Trade Center; the plaintiff's building has been closed for a substantial period since September 11, 2001; tenants have not paid rent; many tenants have abandoned and will abandon the building since they claim the building cannot currently safely be occupied as required by the tenants' leases; the exterior and interior of the building will have to be replaced; carpeting in the building has to be torn up and replaced; the value of the building has been blighted and diminished; and plaintiffs have been otherwise damaged, all of which damages are continuing into the future.

175.     By reason of the foregoing, property damage plaintiffs are entitled to recover all of their damages from the defendant.

## DEFAULT TRIAL DEMAND

Plaintiffs demand trial by default on all issues so triable.

Dated: New York, New York
           November 19, 2020

KREINDLER & KREINDLER LLP
By: ____/s/ James P. Kreindler_____
James P. Kreindler (JK7084)
Andrew J. Maloney, III (AM8684)
Steven R. Pounian (SP5795)

*Attorneys for Ashton Plaintiffs and
Plaintiffs Executive Committee for
Death and Injury Cases*